## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KENDALL SHELTON, | : | 3:21cv637 (KAD) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CO PAYNE, et al., | : | |
| Defendants. | : | |

### INITIAL REVIEW ORDER

Plaintiff Kendall Shelton, an inmate in the custody of the Connecticut Department of Correction ("DOC") at MacDougall-Walker Correctional Institution ("MacDougall"),[1] filed this 42 U.S.C. § 1983 action against Correction Officer Payne, Lieutenant Russell, DOC Director of Security A. Santiago, Lieutenant and Disciplinary Hearing Officer Dousis, District Administrator John Doe, and DOC Security Risk Group Coordinator Papoosha. Plaintiff alleges that his placement within the Restricted Housing Unit ("RHU") and designation as a participant in a program for gang-affiliated inmates violated his Fourteenth Amendment substantive and procedural due process rights. He seeks damages and injunctive relief.[2] (Compl. ¶¶ 55-65, ECF

---

[1] The Court may "take judicial notice of relevant matters of public record." *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The Connecticut DOC website reflects that Shelton is currently housed at MacDougall as a sentenced inmate. The Court notes that Shelton has not updated his address to reflect that he is incarcerated at MacDougall, although the Court's order on his motion for *in forma pauperis* status informed him of his obligation to notify the court if he changed his address. Order, ECF No. 10. If Shelton does not update his address within 30 days of this ruling, the court will dismiss this action.

[2] All Defendants are sued in their individual capacities, and Defendants Papoosha and Santiago are sued in their official capacities. (Compl. ¶¶ 4-10.)

No. 1.)

For the reasons set forth below, the Court will permit some of Plaintiff's claims to proceed beyond initial review.

**STANDARD OF REVIEW**

Pursuant to 28 U.S.C. § 1915A(b), the court must review prisoner civil complaints against governmental actors and "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." *Id.* Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts still have an obligation to interpret "a pro se complaint liberally," the complaint must include sufficient factual allegations to meet the standard of facial plausibility. *See Harris*

*v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).[3]

**ALLEGATIONS**

Following an arrest by the Meriden Police Department, Plaintiff entered the New Haven Correctional Center ("NHCC") on January 26, 2020. (Compl. ¶¶ 11-12.) On that same day, District Administrator John Doe directed Plaintiff to meet with Correction Officer Payne, who accused Plaintiff being a member of the Bloods gang. (Compl. ¶¶ 13–15.) Plaintiff denied these allegations, and Correction Officer Payne responded by offering a number of Facebook posts as evidence of Plaintiff's gang affiliation. (Compl. ¶¶ 15–16.) Correction Officer Payne also indicated that Plaintiff's tattoo, which consisted of two hearts on his face, showed Blood membership. (Compl. ¶ 19.) Plaintiff continued to profess that he was not affiliated with the Bloods and stated that the tattoo symbolized his crying for love that he never received due to a lonely childhood. (Compl. ¶ 20.) Shelton was then escorted to the RHU pending a determination of whether Plaintiff was a member of a Security Risk Group ("SRG"). (Compl. ¶ 22.)

---

[3] The court limits its review for purposes of 28 U.S.C. § 1915A to federal law claims because the purpose of an initial review order is to conduct a prompt initial screening to determine whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants.   If there are no facially plausible federal law claims, then the Court would decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.   On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment.   More generally, the court's determination for purposes of an initial review order under 28 U.S.C. § 1915A that any claim may proceed against a defendant is without prejudice to the right of any defendant to seek dismissal of any claims by way of a motion to dismiss or motion for summary judgment in the event that the court has overlooked a controlling legal principle or if there are additional facts that would warrant dismissal of a claim.

DOC has a specific correctional program for individuals with an affiliation with certain gangs, which are designated SRGs. Plaintiff alleges that this SRG Program is punitive and houses inmates in a hostile environment that is similar to Administrative Segregation. (Compl. ¶ 23.) According to Plaintiff, the program has five phases, with phase one being the most punitive, and, by "penalizing" participants in the SRG program, the program incentivizes SRG-affiliated inmates to "behave in order to progress to the next phase." (Compl. ¶ 24.) The program's ultimate goal is to have the inmate renounce his gang affiliation. (*Id.*)

On January 30, 2020, Plaintiff attended a hearing before Lieutenant Dousis. (Compl. ¶¶ 25–26.) Lieutenant Dousis stated that Plaintiff had no chance of "beating this affiliation" and that Plaintiff should, therefore, just sign a document to "make it easier on everyone." (Compl. ¶ 26.) Plaintiff refused to sign the document, asked for an advocate and an opportunity to call witnesses, and continued to deny any gang affiliation. (Compl. ¶ 27.) A back and forth ensued, and Lieutenant Dousis eventually became irritated, called Plaintiff a low-life gang banger, and threatened that if Plaintiff did not sign the paper, then Lieutenant Dousis would find him guilty and place him in the harshest phase of the SRG Program. (Compl. ¶¶ 28–29.) After Plaintiff hesitated, Lieutenant Dousis stood up to leave and stated that Plaintiff would be "found guilty" and held in the RHU until space opened in the most punitive phase of the SRG Program at Northern. (Compl. ¶ 35.) Plaintiff protested once again, signed the paper, and was sent back to his cell. (Compl. ¶¶ 36–37.)

On February 22, 2020, Plaintiff was transferred to Corrigan to start the SRG Program in

Phase 3. (Compl. ¶ 38.) Plaintiff feared for his safety because the inmates near his cell were

yelling threats, banging on the doors, and making vulgar gestures. (Compl. ¶ 39.) His cellmate

inquired about his affiliation, and Plaintiff answered that he did have an affiliation but was

designated based on his Facebook posts. (Compl. ¶ 40.) His cellmate stated that he was a Crip

and was not going to tolerate living with a Blood. (Compl. ¶¶ 41–42.) Plaintiff explained that he

was not into all that "gang stuff." (Compl. ¶ 43.) Although Plaintiff was also approached by

different individuals affiliated with different gangs, Plaintiff told the individuals that he was not

affiliated despite being designated as a Blood. (Compl. ¶ 46.) A high-ranking Blood member

later told Plaintiff to pay $5.00 per week for protection. (Compl. ¶ 47.) Plaintiff agreed to the

terms out of fear. (Compl. ¶ 48.)

When his cellmate found out that Plaintiff was paying the Bloods, the cellmate threatened

to hurt Plaintiff if he did not pay the cellmate the same fee. (Compl. ¶ 48.) Plaintiff later had a

physical confrontation with his cellmate. (Compl. ¶ 49.) Plaintiff was brought to the RHU for

seven days before being returned to the same unit. (*Id.*)

On April 17, 2020, Plaintiff was released from custody, but he reentered NHCC on May

26, 2020. (Compl. at ¶ 50.) Plaintiff was still designated as an SRG inmate and was escorted

directly to the RHU (*Id.*) Correction Officer Payne stated that no new evidence of Plaintiff's

affiliation had surfaced but explained that Plaintiff was designated as an SRG inmate because he

had not finished the program during his time in custody. (Compl. ¶ 52.)

**DISCUSSION**

5

Title 42, Section 1983 provides that "[e]very person who, under color of any statute . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." "The common elements to all § 1983 claims are: "(1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Lee v. City of Troy*, --- F. Supp. 3d ---, 2021 WL 567240, at *8 (N.D.N.Y. Feb. 16, 2021) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). Further, a plaintiff must allege facts to establish the personal involvement of a defendant in an alleged constitutional violation in order to hold that defendant liable for an award of damages under § 1983. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). To "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020).

The Complaint contains factual allegations of several constitutional deprivations, which are actionable under § 1983, as well as a state law cause of action. Plaintiff alleges that he has been deprived of his Fourteenth Amendment substantive due process rights—both in terms of the punitive nature of his placement in the SRG program and a deliberate indifference to his conditions of confinement—and his Fourteenth Amendment procedural due process rights. To

the extent the Plaintiff also intended to raise a First Amendment retaliation claim, the Court will review that claim as well.

### Fourteenth Amendment Substantive Due Process

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). Consequently, a pretrial detainee can establish a Fourteenth Amendment due process claim "for inhumane conditions of confinement either by proving an official's deliberate indifference to those conditions, or by proving that those conditions are punitive." *Id.* at 34 n.12 (citations omitted). These theories are distinct, and each has its own standards for establishing liability. *Id.* (citing, generally, *Kinglsey v. Hendrickson*, 576 U.S. 389 (2015)).

Plaintiff alleges that Defendants have violated his substantive Due Process rights both by subjecting him to punitive conditions of confinement and by being deliberately indifferent to his health and safety. The former charge revolves around Plaintiff's allegations concerning his status as a member of an SRG, and the latter charge implicates Plaintiff's placement in a cell with a member of the Crips, a gang with a historical rivalry with the Bloods.

Punitive Conditions

"Under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (alteration

omitted)).   To establish a claim that conditions are punitive, a pretrial detainee must allege facts tending to show that a condition was "imposed for the purpose of punishment," either directly by offering proof of such intent or indirectly by indicating that the condition is not reasonably related to a legitimate governmental purpose, such as institutional security. *See Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017). A punitive intent may also be inferred if the conditions of confinement are "otherwise arbitrary." *See Banks v. Michaud*, No. 3:20-cv-00326 (JAM), 2020 WL 7188476, at *5 (D. Conn. Dec. 7, 2020) (citing *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 55 (2d Cir. 2017)).[4]

Plaintiff's allegations include two circumstances that may raise an inference of punitive conditions of confinement. First, the Complaint indicates that Correction Officer Payne and Lieutenant Dousis designated Plaintiff as a member of an SRG arbitrarily and that the SRG Program is itself, punitive. According to the Complaint, Correction Officer Payne thought Plaintiff was SRG-affiliated because of "old" Facebook posts, and Correction Officer Payne also refused to believe that Plaintiff's tattoos signified his lonely childhood rather than gang affiliation. Lieutenant Dousis, at a hearing following Correction Officer Payne's actions, allegedly stated that Plaintiff had no chance of beating his SRG-affiliation and pressured him to

---

[4] In *Almighty Supreme Born Allah*, the Second Circuit also indicated that a substantive due process claim for punitive confinement may not lie "where prison officials subjected pretrial detainees to such measures in response to specific evidence that those detainees posed a risk to institutional security, and where the measures were not excessive in relation to that purpose." 876 F.3d at 55–56. Whether this type of inquiry has been made is a question best addressed by a defendant in an appropriate motion. *See id.* (citing *Cabral v. Strada*, 513 F. App'x 99 (2d Cir. 2013) and *Taylor v. Comm'r of N.Y.C. Dep't of Corr.*, 317 F. App'x 80 (2d Cir. 2009), both of which affirmed that no substantive due process violation occurred following, respectively, briefing on a habeas petition and a motion for summary judgment)).

sign a paper (presumably to make an admission of SRG affiliation). These allegations, construed broadly, suggest that Correction Officer Payne and Lieutenant Dousis acted to place Plaintiff in the SRG program without establishing a reasonable relationship between the potential threat posed by Plaintiff and the institution's interest in security, leaving an inference that Plaintiff was being punished in violation of his substantive due process rights.

Second, Plaintiff's direct placement into a restrictive status upon re-admission to custody is similarly sufficient to create the inference that Plaintiff's placement was punitive. Upon re-entry, Plaintiff alleges that there was no evaluation of Plaintiff's situation, let alone an individualized consideration of the potential threat that Plaintiff posed. These allegations give rise to a plausible inference that Plaintiff's placement in the SRG Program was punitive. *See Banks v. Michaud*, No. 3:20-CV-00326 (JAM), 2020 WL 7188476, at *5 (D. Conn. Dec. 7, 2020) ("it is enough for initial pleading purposes that [plaintiff] has alleged that more restrictive terms of confinement were imposed on him as a pretrial detainee upon re-admission to DOC . . . without individualized consideration of whether these terms continued to be warranted.").

Accordingly, the Court will permit Plaintiff's Fourteenth Amendment substantive due process claim based on his initial placement in the SRG Program to proceed against Correction Officer Payne and Lieutenant Dousis, who are alleged to have direct personal involvement in the constitutional violation. For initial pleading purposes, the Court will also permit Plaintiff's substantive due process claim to proceed against District Administrator John Doe, who told Plaintiff to go see Correction Officer Payne and was thereby plausibly involved with Plaintiff's

SRG designation. Plaintiff has, however, not alleged any facts suggesting that Defendants Russell, Papoosha, or Santiago had direct personal involvement in the substantive due process violation based on his alleged punitive placement. *See Tangreti v. Bachman*, 983 F.3d 609, 620 (2d Cir. 2020). Consequently, to the extent that the Complaint alleges that Defendants Russel, Papoosha, and Santiago face a damages claim related to Plaintiff's placement in punitive conditions of confinement, those claims are dismissed.

<u>Deliberate Indifference to Health and Safety</u>

As discussed above, pretrial detainee may establish a Fourteenth Amendment substantive due process claim based on the conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To state such a claim, a plaintiff must satisfy two prongs: an "objective prong," by showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a "subjective, or *mens rea*, prong," by showing that the official acted with at least deliberate indifference to the challenged conditions. *Darnell*, 849 F.3d at 29.

The objective element can be met by showing the challenged "conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which include the risk of serious damage to physical and mental soundness." *Darnell*, 849 F.3d at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). "[T]he conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (citation and internal quotation marks omitted).

This inquiry focuses on the "severity and duration" of the conditions, "not the detainee's resulting injury." *Id.* (citing *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015)). Further, "conditions of confinement may be aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Darnell*, 849 F.3d at 30 (quotations and citations omitted). The Supreme Court has identified the following basic human needs of a person in custody: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions and exercise. *See Jusino v. Rinalidi*, No. 3:18cv2004 (MPS), 2019 WL 1596574, at *4 (D. Conn. Apr. 15, 2019) (citing *Wilson v. Seiter*, 501 U.S. 294, 304 (1991); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981)).

Under the second element, the subjective or *mens rea* prong, a detainee must allege that the prison official "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 36. Though sometimes labeled as a subjective prong, as applied to pretrial detainees, the requisite mens rea is defined objectively, *Id.* at 35, and is therefore more similar to recklessness in the civil sense than to any subjective criminal intent. *See id.* at 32, 36.

Plaintiff's allegations indicate that he was subjected to a risk of physical harm by other

11

SRG inmates, including his Crip-affiliated cellmate, while he was confined in the SRG Phase 3 Program. (Compl. ¶¶ 38-49.) Plaintiff's allegations are sufficient to satisfy the first prong of the analysis because his placement with a rival gang member implicates the basic human need for safety and security. *See Jusino*, 2019 WL 1596574, at *4. However, Plaintiff's allegations are insufficient to satisfy the *mens rea* prong because he has failed to allege that any of the named defendants either knew or should have known that Plaintiff's specific placement with a member of the Crips would likely cause him harm. The Complaint does not indicate which, if any, of the named Defendants was responsible for placing Plaintiff in that particular cell. Moreover, Plaintiff has not alleged that any of the named Defendants knew or should have known of the threat from the high-ranking Blood member or the actual threat and assault by his cellmate. Defendants could not have been deliberately indifferent to Plaintiff's situation without that responsibility or without that knowledge. Accordingly, the Court will dismiss Plaintiff's Fourteenth Amendment deliberate indifference claims.

*Fourteenth Amendment Procedural Due Process*

"The Fourteenth Amendment reads in relevant part: 'nor shall any State deprive any person of 'life, liberty, or property, without due process of law,' and protects 'the individual against arbitrary action of government.'" *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 459–60 (1989) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)). Courts engage in a two-step process to determine if there has been a violation of procedural due process: courts first asks whether there exists a liberty or property interest of which a person has been deprived

by the state, and, if so, courts then ask whether the procedures followed by the state were constitutionally sufficient. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (per curiam).

"Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)). "The interest survives a criminal conviction and incarceration, pretrial detention, or involuntary civil commitment." *Id.* Moreover, a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with due process of law, and, consequently, a pretrial detainee retains a liberty interest in being free from punishment and the use of certain restraints while being held in custody awaiting trial. *See Sandin v. Conner*, 515 U.S. 472, 485 (1995); *see also Benjamin v. Fraser*, 264 F.3d 175, 188–89 (2d Cir. 2001) (finding that a pretrial detainee need not demonstrate that the restraints on his liberty constitutes an "atypical and significant hardship" to bring a procedural due process claim). Here, as discussed above, Plaintiff, who at the time he was assigned to the SRG Program was a pretrial detainee, had a liberty interest in being free from punitive restrictions and some process was due before he could be assigned to the SRG Program. His claims therefore meet the first requirement of a due process violation.

As to the level of procedural protection required, *i.e.,* whether the procedures are constitutionally sufficient, depends on the purpose of the hearing. *See Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987) (citing *Hewitt v. Helms*, 459 U.S. 460 (1983)). Indeed, "due process is flexible and calls for such procedural protections as the particular situation demands." *Benjamin*

*v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). For example, in the correctional facility context, "the procedures required by *Wolff* apply if the restraint on liberty is imposed for disciplinary reasons; if the restraint is for 'administrative' purposes, the minimal procedures outlined in *Hewitt* are all that is required." *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) (referring to *Hewitt v. Helms*, 459 U.S. 460 (1983); *Wolff v. McDonnnell,* 418 U.S. 539 (1974)). *See also Dilworth v. Adams*, 841 F.3d 246, 253–54 (4th Cir. 2016) (noting that there is flexibility in the amount of process due but also that there are constitutional minimums that must be met whenever a liberty interest is invaded). The Second Circuit has further explained that if the restraints are imposed for disciplinary purposes, then the decision to impose those restraints must be supported by "some '*reliable* evidence.'" *Elder v. McCarthy*, 967 F.3d 113, 129 (2d Cir. 2020) (quoting *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004) (emphasis in *Elder*)).

Here, it is not clear whether Plaintiff's classification as an SRG member was administrative or disciplinary.   However, Plaintiff refers repeatedly to being found "guilty" of being affiliated with an SRG, and the Complaint describes the SRG Program as a way to correct participants' association with dangerous groups. The Complaint therefore plausibly alleges a disciplinary process which requires compliance with *Wolff's* mandate. Plaintiff alleges that he requested but was not afforded an advocate and a hearing. He alleges that Lieutenant Dousis threatened to find him guilty and subject him to the most severe of sanctions if he did not admit his gang affiliation.   This conduct, in addition to raising questions as to whether the process was

14

constitutionally sufficient, also raise an additional inference that Plaintiff's affiliation was not based on reliable evidence. Indeed, similar allegations have survived the initial review process before. *See Lexis v. Bellemare*, No. 3:18-CV-1403 (JAM), 2019 WL 1596571, at *2, *7 (D. Conn. Apr. 15, 2019) (permitting procedural due process claim to proceed where correctional staff told inmate that if he did not admit to the charge in the report, he would still be sent to Northern and would also receive sanctions of 90 days loss of phone, recreation, and commissary). Accordingly, the Court will permit this claim to proceed against Correction Officer Payne, District Administrator Doe, and Lieutenant Dousis in their individual capacities for damages. Plaintiff has not, however, alleged any claim for damages against Defendants Russell, Santiago or Papoosha on this claim because he has not alleged that any of these defendants have any plausible direct personal involvement with this procedural due process violation.

And as to Plaintiff's allegations that he was placed in the SRG Program upon his May 26, 2020 reentry into NHCC without any consideration or hearing, these allegations plausibly allege a procedural due process violation. Indeed, Plaintiff alleges that he received *no* process as a part of his redesignation, whether Plaintiff's redesignation was administrative or disciplinary in nature.  *See e.g. Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 56–57 (2d Cir. 2017) (finding that a pretrial detainee had a liberty interest in avoiding administrative segregation upon readmission to a correctional facility even though the detainee had been previously designated for that status). Accordingly, this claim may proceed against Correction Officer Payne, who was the only individual mentioned in this part of the complaint, in his individual capacity for

damages. As Plaintiff has not alleged any plausible direct involvement by Defendants Russell, John Doe, Santiago, Dousis, or Papoosha in this procedural due process violation, he may not proceed against these defendants on this claim for damages.

**First Amendment Retaliation**

Although it does not list the claim separately, the Complaint may also be construed to assert a claim that Plaintiff faced retaliation for the exercise of his First Amendment right to post on social media. Indeed, the Supreme Court has recognized a First Amendment interest in posting on social media, *see Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017), and the Complaint indicates that Correction Officer Payne referred to Plaintiff's Facebook posts during the time that Plaintiff was designated for the SRG Program.

To establish a claim for unlawful retaliation against First Amendment speech, a plaintiff must prove that he engaged in speech activity that is protected by the First Amendment and that a governmental defendant took adverse action against the plaintiff because of the plaintiff's protected speech activity. *See Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (citing *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)). However, the use of an individual's prior statements—including social media posts—as evidence in a security-designation proceeding, without more, is not enough to establish that the adverse action was taken in retaliation for the individual's speech. *See Caves v. Payne*, No. 3:20-cv-15 (KAD), 2020 WL 1676916, at *4 (D. Conn. April 6, 2020); *Wilson v. Santiago*, No. 3:19-cv-1807 (JAM), 2020 WL 1989135, at *2 (D. Conn. April 27, 2020); *Martinez v. Payne*, No. 3:20-CV-00231 (JAM), 2020 WL 3630422, at

*4 (D. Conn. July 4, 2020). Further, a plaintiff must plausibly plead, and ultimately prove, that he suffered an adverse action that would deter a similarly situated person of ordinary firmness from exercising his or her right to speech. *See Wrobel v. Cty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012).

The Court concludes that Plaintiff cannot state a plausible claim under the First Amendment because allegations of prison officials' reliance on social media posts in determining an inmate's SRG affiliation and placement fails to satisfy the "causal connection between the adverse action and the protected speech," as required to state a valid First Amendment retaliation claim. *Caves*, 2020 WL 1676916, at *4; *Wilson*, 2020 WL 1989135, at *2; *Martinez*, 2020 WL 3630422, at *4. As this Court has noted, "[t]he First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Caves*, No. 3:20-CV-15 (KAD), 2020 WL 1676916, at *4 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)); *see also Martinez*, No. 3:20-CV-00231 (JAM), 2020 WL 3630422, at *4, and *Wilson*, No. 3:19-CV-1807 (JAM), 2020 WL 1989135, at *3 (same); *United States v. Herron*, 762 F. App'x 25, 30 (2d Cir. 2019) (same). Plaintiff's allegations establish that the Defendants used his posts from his Facebook page as evidence of his gang affiliation. However, absent allegations showing that any defendant sought to punish or retaliate against him for exercising his First Amendment rights, the complaint does not plausibly allege a First Amendment retaliation claim.

**Official Capacity Claims & the Eleventh Amendment**

Plaintiff asserts claims against DOC Director of Security Santiago and Security Risk Group Coordinator Papoosha in both their official and individual capacities. To the extent that the claims against these individuals in their official capacities seek damages, those claims are barred by the Eleventh Amendment. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 n.17 (1985) ("The Court has held that § 1983 was not intended to abrogate a State's Eleventh Amendment immunity."). However, Plaintiff also seeks two forms of injunctive relief: Plaintiff requests both an order that would force Defendant Papoosha to remove Plaintiff from the SRG Program and place Plaintiff back in the general population as well as an order for Defendant Papoosha to update the DOC's policies and procedures for designating inmates. Bringing these claims requires Plaintiff to suffer an ongoing or prospective injury that injunctive relief could address.

A plaintiff may proceed against a defendant in his official capacity to the extent he alleges an ongoing constitutional violation. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254-55 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). This exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v.*

*Metcalf & Eddy*, 506 U.S. 139, 146 (1993).

Indeed, a plaintiff seeking such relief must maintain a legally cognizable interest in the outcome of the case throughout the case's litigation or else the case moves beyond the federal court's jurisdiction and becomes moot. *See Muhammed v. City of New York Dep't of Corrections*, 126 F.3d 119, 122–23 (2d Cir. 1997); *see also Lews v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) ("Article III's case-or-controversy requirement subsists through all stages of federal judicial proceedings . . . it is not enough that a dispute was very much alive when suit was filed . . .") (citations omitted)).

Although the Connecticut DOC website reflects that Plaintiff is now both housed at MacDougall and serving time as a sentenced inmate, he may still be subject to confinement in the SRG Program. Accordingly, the Court will permit his injunctive request to be returned to the general population to proceed against Defendant SRG Coordinator Papoosha as a remedy to an ongoing Fourteenth Amendment substantive due process violation based on his allegedly punitive placement. *See United States v. Martin*, 974 F.3d 124, 140 (2d Cir. 2020) ("While it is true that a criminal case does not necessarily become moot when an inmate finishes serving the sentence, it will only remain a live case or controversy if there exists some concrete and continuing injury or collateral consequence resulting from the conviction.") (quotations and alterations omitted).

As to Plaintiff's second requested injunctive relief—his request for Papoosha to update SRG affiliation designation policies and procedures—the claim must be dismissed as moot. *See*

*Muhammed v. City of New York Dep't of Corrections*, 126 F.3d 119, 123 (2d Cir. 1997) (finding a plaintiff's claim for an injunctive relief that would have required DOC to hire religious personnel because plaintiff was no longer in DOC custody). Here, Plaintiff has already been through the designation process. An order that would force Defendant Papoosha to update the policies and procedures for the that intake process would not alleviate any injury suffered by Plaintiff, and the claim is therefore moot.

**ORDERS**

The Court enters the following orders:

(1) Plaintiff's case shall proceed on his Fourteenth Amendment substantive due process claims based on his allegedly punitive placement in the SRG Program against Correction Officer Payne, Lieutenant Dousis and District Administrator John Doe in their individual capacities; on his Fourteenth Amendment procedural due process claims against Correction Officer Payne, District Administrator Doe, and Lieutenant Dousis in their individual capacities; and on his request to be returned to the general population against Defendant Papoosha in his official capacity as a remedy for his Fourteenth Amendment substantive due process violation. Plaintiff's Fourteenth Amendment deliberate indifference and First Amendment claims are DISMISSED without prejudice. All individual capacity claims against Defendant Papoosha are DISMISSED without prejudice. All claims against Defendants Russell and Santiago in their official or individual capacities are DISMISSED without prejudice. Plaintiff's request for a court order for Papoosha to update SRG affiliation designation policies and procedures is also DISMISSED.

**Plaintiff is instructed to provide the Court with written notice of his current address. If Plaintiff does not update his address within 30 days of this ruling, the court will dismiss this action.**

(2) The Clerk shall verify the current work address of Correction Officer Payne, Lieutenant Dousis with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to them at their confirmed addresses on or before **August 11, 2021**, and report on the status of the waiver request on the thirty-fifth (35th) day after mailing. If a defendant fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal Service is directed to effect service of the Complaint and this Order on Defendant SRG Coordinator Papoosha in his official capacity at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, on or before **August 11, 2021** and to file a return of service by **August 20, 2021.**

(4) The Clerk cannot effect service on the unnamed Doe defendant without that defendant's full name and current work address. Plaintiff is directed to obtain this information during discovery and to file a notice containing the information with the court on or before **October 28, 2021.** Once the Doe defendant has been identified, the court will order that he or

she be served with a copy of the complaint. Failure to identify the Doe defendant will result in the dismissal of all claims against that defendant.

(5) The clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(6) Defendants shall file a response to the Complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them, or within sixty (60) days of the filing of any amended complaint, whichever is later. If defendants choose to file an answer, defendants shall admit or deny the allegations and respond to the cognizable claims recited above. Defendants may also include any and all additional defenses permitted by the Federal Rules.

(7) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed by **January 28, 2022.** Discovery requests need not be filed with the Court.

(8) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(9) All motions for summary judgment shall be filed by **February 28, 2022.**

(10) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(11) If the plaintiff changes his address at any time during the litigation of this case,

Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his new address.

(12) Plaintiff shall utilize the Prisoner E-filing Program when filing documents with the court. Plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

**SO ORDERED** this 28th day of July 2021 at Bridgeport, Connecticut.


_____/s/_____
Kari A. Dooley
United States District Judge

23